## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MONICA CARAFFA, individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>v.<br><br>TD BANK, N.A.,<br><br>    Defendant. | Case No. 2:24-cv-02214-CMR<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiff Monica Caraffa ("Plaintiff") files this class action complaint on behalf of herself and all others similarly situated (the "Class Members") against Defendant TD Bank, N.A. ("Defendant" or "TD").  Plaintiff brings this action based upon personal knowledge of the facts pertaining to herself, and on information and belief as to all other matters, by and through the investigation of undersigned counsel.

## NATURE OF THE ACTION

1.      This is a class action lawsuit brought on behalf of all Pennsylvania residents who have accessed and navigated Defendant's website, td.com and tdbank.com (the "Website").

2.      Defendant procures several third parties, Adobe Inc. ("Adobe"); Google LLC ("Google"); and Meta Platforms, Inc. ("Meta") (collectively, the "Third Parties"), to intercept communications sent and received by Plaintiff and Class Members, including communications that contain sensitive and confidential information—i.e., "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the "Gramm-Leach-Bliley Act" or "GLBA").  By failing to procure consent before enabling the Third Parties to intercept these communications, Defendant violated 18 Pa. Cons. Stat. § 5701, *et seq.* (the Pennsylvania Wiretapping and Electronic Surveillance Control Act or "WESCA").

1

## JURISDICTION AND VENUE

3.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d) because this is a class action where there are more than 100 members and the aggregate amount in controversy exceeds $5,000,000.00, exclusive of interest, fees, and costs, and at least one member of the putative Class is a citizen of a state different from Defendant.

4.    The Court has personal jurisdiction over Defendant because Defendant has purposefully availed itself of the laws and benefits of doing business in Pennsylvania, and Plaintiff's claims arise out of Defendant's forum-related activities.  Plaintiff accessed and navigated the Website while in Pennsylvania, and Plaintiff's communications with Defendant were thus wiretapped by the Third Parties in Pennsylvania.

5.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial portion of the events giving rise to this action occurred in this District.

## THE PARTIES

### Plaintiff Caraffa

6.    Plaintiff Monica Caraffa is an adult citizen of the Commonwealth, domiciled in Philadelphia, Pennsylvania.  On or around February 13, 2009, Plaintiff created a Facebook account.  Numerous times, including on or around March 13, 2024, Plaintiff Caraffa visited the Website on the same browser that she used to access Facebook.  Plaintiff Caraffa was in Pennsylvania when she visited the Website.  Plaintiff accessed and navigated the website to browse and engage with TD's financial products and services.  Each of these communications was intercepted in transit by the Third Parties—as enabled by Defendant—including communications that contained Plaintiff Caraffa's confidential, "nonpublic personal information" as defined by the Gramm-Leach-Bliley Act.  Neither Defendant nor the Third Parties procured Plaintiff Caraffa's prior consent to this interception.  Below is an image of Plaintiff's activity off Meta technologies, evincing activity received from the Website.[1]

---

[1] *See* https://www.facebook.com/help/2207256696182627.

*Defendant*

7.      Defendant TD Bank, N.A. is a national association incorporated under the laws of the National Bank Act, with its principal place of business at 1701 Marlton Pike East, Suite 200, Cherry Hill, New Jersey, 08003.  Defendant has approximately 1,100 branches and 2,600 ATMs in the United States, including approximately 168 branches in the Commonwealth.[2]  Defendant provides banking services to many of Pennsylvania's banking customers.  Pursuant to the systematic processes described herein, Defendant assisted the Third Parties with intercepting Plaintiff's communications, including those that contained personally identifiable and confidential information.  Defendant assisted these interceptions without Plaintiff's knowledge, consent, or express written authorization.  By failing to receive the requisite consent, Defendant unlawfully disclosed Plaintiff's personally identifiable and confidential information.

## FACTUAL ALLEGATIONS

## I.      The Pennsylvania Wiretapping and Electronic Surveillance Control Act

8.      The Pennsylvania Wiretapping and Electronic Surveillance Control Act prohibits: (a) the interception or procurement of another to intercept any wire, electronic or oral communication; (b) the intentional disclosure of the contents of any wire, electronic or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic or oral communication; and (c) the intentional use of the contents of any wire, electronic or oral communication that the discloser knew or should have

---

[2] TD, FIND A TD BANK STORE OR ATM BY STATE, https://locations.td.com/us.

known was obtained through the interception of a wire, electronic or oral communication.  18 Pa. Cons. Stat. § 5703.

9.      Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose or use, a wire, electronic, or oral communication in violation of the WESCA is subject to a civil action for: (a) actual damages, not less than liquidated damages computed at the rate of $100/day for each violation or $1,000, whichever is higher; (b) punitive damages; and (c) reasonable attorneys' fees and other litigation costs incurred. 18 Pa. Cons. Stat. § 5725(a).

10.     Under the WESCA, "intercept" is defined as any "[a]ural or other acquisition of the contents of any wire, electronic or oral communication through the use of any electronic, mechanical or other device."  18 Pa. Cons. Stat. § 5702.

11.     Under the WESCA, "contents" is defined as "used with respect to any wire, electronic or oral communication, is any information concerning the substance, purport, or meaning of that communication."  18 Pa. Cons. Stat. § 5702.

12.     Under the WESCA, "person" is defined as "any individual, partnership, association, joint stock company, trust or corporation."  18 Pa. Cons. Stat. § 5702.

13.     Under the WESCA, "electronic communication" is defined as "[a]ny transfer of signs, signals, writing, images, sounds, data or intelligence of any nature transmitted in whole or in part by a wire, radio, electromagnetic, photoelectronic or photo-optical system."  18 Pa. Cons. Stat. § 5702.

14.     Pursuant to the WESCA, the Commonwealth and any of its officers, officials or employees who may be shielded from liability under the WESCA by the doctrine of sovereign immunity waive such immunity.  18 Pa. Const. Stat. § 5725(b).

**II.    The Gramm-Leach-Biley Act**

15.     As Congress recognized, "nonpublic personal information" is confidential.

16.     Per 16 C.F.R. § 313.3(n):

(1) Nonpublic personal information means:

(i)     Personally identifiable financial information; and

4

(ii)      Any list, description, or other grouping of consumers (and publicly available information pertaining to them) that is derived using any personally identifiable financial information that is not publicly available.

17.      Per 16 C.F.R. § 313.3(o):

(1) Personally identifiable financial information means any information:

(i)      A consumer provides to [a financial institution] to obtain a financial product or service from [a financial institution];

(ii)      About a consumer resulting from any transaction involving a financial product or service between [a financial institution] and a consumer; or

(iii)      [A financial institution] otherwise obtain[s] about a consumer in connection with providing a financial product or service to that consumer.

(2) Examples—(i) Information included. Personally identifiable financial information includes:

(A)      Information a consumer provides to [a financial institution] on an application to obtain a loan, credit card, or other financial product or service;

(B)      Account balance information, payment history, overdraft history, and credit or debit card purchase information;

(C)      The fact that an individual is or has been one of [a financial institution's] customers or has obtained a financial product or service from [a financial institution];

(D)      Any information about [a financial institution's] consumer if it is disclosed in a manner that indicates that the individual is or has been [a financial institution's] consumer;

(E)      Any information that a consumer provides to [a financial institution] or that [a financial institution]or [its] agent otherwise obtain[s] in connection with collecting on, or servicing, a credit account;

(F)      Any information [a financial institution] collect[s] through an Internet "cookie" (an information collecting device from a web

server); and

(G)     Information from a consumer report.

18.     Thus, Plaintiff's and Class Members' "nonpublic personal information" is confidential, under federal law.

19.     Still,  unbeknownst to Plaintiff and Class Members, and pursuant to agreements with Adobe, Google, and Meta, Defendant voluntarily embedded the Third Parties' tracking technologies on its Website (which it owns and operates).  This allowed Adobe, Google, and Meta to eavesdrop on confidential communications between Website users and TD.  This is despite the fact that neither Defendant nor the Third Parties procured Plaintiff and Class Members' consent prior to this interception.

20.      Website users' confidential communications are the product of Website users affirmatively entering and interacting with information on the Website (that is to say, the confidential communications are not procedurally or automatically generated).  Instead, the confidential communications include, but are not limited to: full-string, detailed URLs disclosing Website users' individualized Website search terms and queries; and Website users' button clicks (conveying responses to questions and prompts, conveying Website users' respective desires that the Website would supply them with certain information and/or responses, and conveying other selections).

21.     These confidential communications constitute "nonpublic personal information" under the GLBA—information that consumers provided to TD to obtain financial products or services from TD; information about consumers resulting from transactions involving a financial product or service between TD and consumers; and information that TD otherwise obtained about consumers in connection with providing financial products or services to consumers.  *See* 16 C.F.R. § 313.3(o)(1).

22.     Indeed, Website users' confidential communications include the fact that an individual is or has been one of TD's customers or has obtained a financial product or service from TD; information about a TD consumer disclosed in a manner that indicates that the

individual is or has been TD consumer; and information that TD collects through Internet tracking technologies.  *See* 16 C.F.R. § 313.3(o)(2).

III.    **The Third Parties, as Enabled by Defendant, Wiretap Pennsylvanians' Communications, in Violation of WESCA**

 A. **Overview of the Third Parties' Tracking Technologies**

 23. The Third Parties wiretap the Website with their respective tracking technologies.

 24. Adobe wiretaps the Website with trackers associated with the "Adobe Experience Cloud."  These trackers include:

> 1.  The "Adobe Experience Platform Web SDK"[3] which sends data "in a single stream … to the [Adobe] Platform Edge Network[,] … a globally distributed, fast, and reliable network of servers capable of receiving and processing … datastreams for products like Adobe Target, Adobe Audience Manager, and Adobe Analytics"[4]; and
>
> 2.  JavaScript libraries called "AT.js [which] sen[ds] a call to Adobe Target, DIL.js [which] sen[ds] a call to Adobe Audience Manager, and [] AppMeasurement.js [which] sen[ds] a call to Adobe Analytics."[5]

On information and belief, Defendant's usage of the Adobe Experience Cloud includes, *inter alia*, Adobe Analytics, Adobe Audience Manager, the Adobe Experience Platform, and Adobe Target.[6] *See infra* § III.B.1.

 25. Adobe Analytics offers "real-time insights based on a holistic view of [the] customer[,]"[7] including "complex segmentation and predictive tools for analyzing website traffic[]"; "marketing analytics" that "help[] organizations understand where customers interact with their brands, which channels customers prefer, and which experiences resonate with them[]";

---

[3] ADOBE, ADOBE EXPERIENCE PLATFORM DATA COLLECTION END-TO-END OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/collection/e2e.

[4] ADOBE, DATA COLLECTION OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/collection/home.

[5] ADOBE, ADOBE EXPERIENCE PLATFORM WEB SDK OVERVIEW, https://experienceleague.adobe.com/en/docs/experience-platform/web-sdk/home.

[6] ADOBE, ADOBE EXPERIENCE CLOUD PRODUCTS, https://business.adobe.com/products/adobe-experience-cloud-products.html.

[7] ADOBE, ADOBE ANALYTICS, https://business.adobe.com/products/analytics/adobe-analytics.html

"[a]ttribution [that] lets organizations see how different interactions throughout the customer journey affect conversion[]"; and "[p]redictive analytics [that] uses machine learning and advanced statistical modeling to analyze customer data, find patterns, and predict future behavior[.]"[8]

26.    Adobe Audience Manager "helps collect . . . [d]ata . . . []from consumer interactions on [] websites[,]"[9] using "event call[s]."[10]   Such event calls include "click event[s]" and "impression event[s.]"[11]  "A click event is when a user clicks or interacts with" a Website element and "[a]n impression event is when a[ Website element] is displayed to a user."[12]  Thus, Adobe Audience Manager can be used to collect data such as "[g]ender[,]" "[i]nterests[,]" "[h]ousing [t]ype[,]" "[l]ocation[,]" "[p]romotion [a]ffinity[,]" "[s]pending [p]ower[,]" and other personal details.[13]

27.    The Adobe Experience Platform "enables organizations to centralize and standardize customer data and content from any system and apply data science and machine learning to dramatically improve the design and delivery of rich, personalized experiences."[14]  It can be used, *inter alia*, to "run real-time journey analysis to identify and analyze the abandonment events relevant to [a] business, including all relevant behavioral, attribute, and preference data";

---

[8] ADOBE, ANALYTICS USE CASES,
https://experienceleague.adobe.com/en/docs/analytics/analyze/admin-overview/use-cases.

[9] ADOBE, TYPES OF DATA COLLECTED, https://experienceleague.adobe.com/docs/audience-manager/user-guide/overview/data-types-collected.html?lang=en.

[10] ADOBE, SIGNALS, TRAITS, AND SEGMENTS, https://experienceleague.adobe.com/docs/audience-manager/user-guide/reference/signal-trait-segment.html?lang=en.

[11] ADOBE, COLLECT MEDIA EXPOSURE DATA FROM ADVERTISING DSP CAMPAIGNS,
https://experienceleague.adobe.com/docs/advertising/integrations/audience-manager/media-data-ingestion/collect.html?lang=en.  *See also* https://docplayer.net/17611520-Adobe-marketing-cloud-audience-manager-help.html.

[12] ADOBE, SIGNALS, DECISION MANAGEMENT DATA COLLECTION,
https://experienceleague.adobe.com/docs/journey-optimizer/using/offer-decisioning/collect-event-data/data-collection.html?lang=en.

[13] ADOBE, TYPES OF DATA COLLECTED, https://experienceleague.adobe.com/docs/audience-manager/user-guide/overview/data-types-collected.html?lang=en.

[14] ADOBE, ADOBE EXPERIENCE PLATFORM OVERVIEW,
https://experienceleague.adobe.com/en/docs/experience-platform/landing/home.

"identify lapsed customers with intelligent insights and re-engage them to increase conversion"; "identify and analyze signals from individual customer journeys at scale, giving [] insight into each prospect's conversion needs"; and more.[15]

28.     Adobe Target can be used to "[c]reate A/B and multivariate tests to learn the most effective combination of content, layouts, UX, and more through [] websites[.]"[16] With "AI and machine learning, powered by Adobe Sensei, [clients] can test and personalize at scale well beyond what [they've] been able to achieve with manual or rules-driven approaches alone."[17]

29.     Google wiretaps the Website with trackers associated with "Google Analytics." According to Google, "Google Analytics is a platform that collects data from [] websites and apps to create reports that provide insights into [] business[es]."[18] "To measure a website … [one] add[s] a small piece of JavaScript measurement code to each page on [a] site."[19] Then, "[e]very time a user visits a webpage, the tracking code will collect … information about how that user interacted with the page."[20] This is done through "events" which "let [clients] measure … when someone loads a page, clicks a link, [] makes a purchase[]" and more.[21] Google provides a menu of "recommended events" (i.e., "completes a purchase"; "searches [] website or app"; "select content on [] website or app"; "views an item"; "views their shopping cart")[22] and also allows for "collect[ing] additional information that Google Analytics does not collect

---

[15] ADOBE, KEY USES OF EXPERIENCE PLATFORM,
https://experienceleague.adobe.com/en/docs/experience-platform/landing/getting-started/platform-use-cases.

[16] ADOBE, ADOBE TARGET BENEFITS, https://business.adobe.com/products/target/benefits.html.

[17] Id.

[18] GOOGLE, HOW GOOGLE ANALYTICS WORKS,
https://support.google.com/analytics/answer/12159447.

[19] Id.

[20] Id.

[21] GOOGLE, SET UP EVENTS,
https://developers.google.com/analytics/devguides/collection/ga4/events.

[22] GOOGLE, [GA4] RECOMMENDED EVENTS,
https://support.google.com/analytics/answer/9267735.

automatically[,]" through "custom events."[23]

30.    Meta wiretaps the Website with one of the "Meta Business Tools" called the "Meta Tracking Pixel."  As Meta puts it, the Business Tools "help website owners and publishers, app developers and business partners, including advertisers and others, integrate and share data with Meta, understand and measure their products and services, and better reach and serve people who might be interested in their products and services."[24]  The Business Tools are automatically configured to capture certain data, like when a user visits a webpage, that webpage's Universal Resource Locator ("URL") and metadata, or when a user makes a purchase.[25]  However, Meta's Business Tools can also track other events.  Meta offers a menu of "standard events" from which advertisers can choose, including what content a visitor views or purchases.[26]  Advertisers can even create their own tracking parameters by building a "custom event."[27]  Thus, the Meta Tracking Pixel "tracks [] people and the types of actions they take."[28]  Meta then processes this data, analyzes it, and assimilates it into advertising datasets like Custom Audiences and Lookalike Audiences.[29]

31.    Put succinctly, the Adobe, Google, and Meta tracking technologies send secret instructions to a Website user's browser, without alerting the individual that this is happening.  The trackers then cause the browser to secretly and simultaneously duplicate the user's Website

---

[23] GOOGLE, [GA4] CUSTOM EVENTS, https://support.google.com/analytics/answer/12229021.

[24] META, THE META BUSINESS TOOLS, https://www.facebook.com/help/331509497253087.

[25] *See* META, META PIXEL GUIDE: ADVANCED, https://developers.facebook.com/docs/meta-pixel/advanced; *see also* META, BEST PRACTICES FOR META PIXEL SETUP, https://www.facebook.com/business/help/218844828315224?id=1205376682832142.

[26] META, SPECIFICATIONS FOR META PIXEL STANDARD EVENTS, https://www.facebook.com/business/help/402791146561655?id=1205376682832142.

[27] META, ABOUT STANDARD AND CUSTOM WEBSITE EVENTS, https://www.facebook.com/business/help/964258670337005?id=1205376682832142; *see also* META, APP EVENTS API, https://developers.facebook.com/docs/marketing-api/app-event-api/.

[28] META, RETARGETING, https://www.facebook.com/business/goals/retargeting.

[29] *See* META, META BUSINESS HELP CENTER: CREATE A WEBSITE CUSTOM AUDIENCE, https://www.facebook.com/business/help/1474662202748341; META, AUDIENCE AD TARGETING, https://www.facebook.com/business/ads/ad-targeting; META, ABOUT CUSTOM AUDIENCES, https://www.facebook.com/business/help/744354708981227; META, ABOUT LOOKALIKE AUDIENCES, https://www.facebook.com/business/help/164749007013531.

communications, transmitting these communications to the Third Parties' servers alongside additional information about the Website user's identity.  This entire process occurs within milliseconds.  In other words, when a user communicates with Defendant's Website, those communications are simultaneously and contemporaneously duplicated and sent to the Third Parties at the same time as they are being sent to Defendant.  Thus, the Third Parties' interception of these communications occurs in transit and in real time.

**B.    Defendant Enables Adobe, Google, and Meta to Wiretap the Website**

**1.    Adobe**

32.    Across the Website, Adobe—as enabled by Defendant—contemporaneously intercepts full-string, detailed URLs disclosing Website users' individualized Website search terms and queries.  For example:



```
pageName: /www.td.com/us/en/personal-banking/search
g: https://www.td.com/us/en/personal-banking/search?query=what%20is%20my%20fee%20schedule%20as%20a%20pennsylvania%20resident?&source=1
r: https://www.td.com/us/en/personal-banking
cc: USD
ch: us-en
server: www.td.com
events: event1,event19
aamb: RKhpRz8krg2tLO6pguXWpSolkAcUniQYPHaMWWgdJ3xzPWQmdj0y
v1: D=pageName
c2: What is my fee schedule as a Pennsylvania resident?
```



```
mid: 17554243080212224310189267053266258271
aamlh: 9
ce: UTF-8
pageName: choosemyproduct.tdbank.com/personal/#/personal/name/26-59/borrowing/futureuse/no/
g: https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1
r: https://www.td.com/
cc: USD
ch: us-en
server: choosemyproduct.tdbank.com
```

33.    As shown by the red highlights in above excerpt of the Website's transmissions, Adobe intercepted the full-string, detailed URL: "https://www.td.com/us/en/personal-banking/search?query=what%20is%20my%20fee%20schedule%20as%20a%20pennsylvania%2

0resident?&source=1" which includes the search terms/query: "What is my fee schedule as a Pennsylvania resident?"  As shown by the blue highlights in the above excerpt of the Website's transmissions, Adobe intercepted the full-string, detailed URL: "https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1" which corresponds to "choosemyproduct.tdbank.com/personal/#/personal/name/26-59/borrowing/futureuse/no."  This includes the search terms/queries: "26-59" (as in age); "borrowing" (as in financial goals); "futureuse" (as in need for access to funds); and "no" (as in current homeownership status).

34.    Across the Website, Adobe—as enabled by Defendant—also contemporaneously intercepts and Website users' button clicks (conveying responses to questions and prompts, conveying Website users' respective desires that the Website would supply them with certain information and/or responses, and conveying other selections).  For example:

```
c46: Personal
c47: Home Lending
v61: D=c61
v62: D=c62
v68: D=c21
c70: tdglobal,tdunitedstates
v71: A1 | B1 | C1
c74: https://www.td.com/us/en/personal-banking/book-appointment#/appointment-type
c75: PROD:2.23.0
v140: personal-banking:book-appointment
v144: PROD:1.15.51
v151: D=mid
c.:
a.:
activitymap.:
page: /www.td.com/us/en/personal-banking/book-appointment#/appointment-sub-category
```

35.    As shown by the purple highlights in the above excerpt of the Website's transmissions, Adobe intercepted button clicks on "Personal" (as in appointment type) and "Home Lending" (as in what "I want to talk about").

36.     Testing of the Website indicates that Defendant's usage of the Adobe Experience Cloud includes, *inter alia*, Adobe Analytics, Adobe Audience Manager, the Adobe Experience Platform, and Adobe Target:



2.     **Google**

37.     Across the Website, Google—as enabled by Defendant—contemporaneously intercepts full-string, detailed URLs disclosing Website users' individualized Website search terms and queries.  For example:

```
pscdl: noapi
_eu: EEA
_s: 1
sid: 1723051396
sct: 3
seg: 1
dl: https://www.td.com/us/en/personal-banking/search?query=What%20is%20my%20fee%20schedule%20as%20a%20Pennsylvania%20resident?&source=1
dr: https://www.td.com/us/en/personal-banking
dt: Search Results
en: view_search_results
ep.search_term: What is my fee schedule as a Pennsylvania resident?
_et: 2
tfd: 2133
```

```
are: 1
pae: 1
frm: 0
pscdl: noapi
_eu: EA
_s: 26
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1
dp: /personal/
sid: 1723055144
sct: 1
seg: 1
dr: https://www.td.com/
```

38.     As shown by the red highlights in above excerpt of the Website's transmissions, Google intercepted the full-string, detailed URL: "https://www.td.com/us/en/personal-banking/search?query=what%20is%20my%20fee%20schedule%20as%20a%20pennsylvania%20resident?&source=1" which includes the search terms/query: "What is my fee schedule as a Pennsylvania resident?"  As shown by the blue highlight in the above excerpt of the Website's transmissions, Google intercepted the full-string, detailed URL: "https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1" which corresponds to the search terms/queries: "24-59" (as in age); "borrowing" (as in financial goals); "futureuse" (as in

need for access to funds); and "no" (as in current homeownership status).

39.     Across the Website, Google—as enabled by Defendant—also contemporaneously intercepts and Website users' button clicks (conveying responses to questions and prompts, conveying Website users' respective desires that the Website would supply them with certain information and/or responses, and conveying other selections).  For example:

```
cd3: 2113413797.1723747911
cd10: 139
cd12: aam=8668639,test,8668383
cd22: us-en
cd30: www.td.com
cd31: 1.15.51
cd32:
cd33: Home Lending
cd35:
cd38: Personal
cd40: appointment start
cd62: 2024-08-15T14:53:31.545-04:00
```

40.     As shown by the purple highlights in the above excerpt of the Website's transmissions, Google intercepted button clicks on "Personal" (as in appointment type) and "Home Lending" (as in what "I want to talk about").

**3.     Meta**

41.     Across the Website, Meta—as enabled by Defendant—contemporaneously intercepts full-string, detailed URLs disclosing Website users' individualized Website search terms and queries.  For example:

```
id: 722526119540790
ev: SubscribedButtonClick
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1
rl: https://www.td.com/
if: false
ts: 1723056203115
cd[buttonFeatures]: {"classList":"td-button td-button-block td-button-clear-green br-btn-margin br-btn","destination":"https://choosemyproduct.td
bank.com/personal/#/personal/1/3/4/5/1","id":"","imageUrl":"","innerText":"Earning more rewards on dining or travel","numChildButtons":0,"ta
```

42.     As shown by the red highlight in the above excerpt of the Website's transmissions, Meta intercepted the full-string, detailed URL:

"https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1" which corresponds to the search terms/queries: "24-59" (as in age); "borrowing" (as in financial goals); "futureuse" (as in need for access to funds); and "no" (as in current homeownership status).

43.     Across the Website, Meta—as enabled by Defendant—also contemporaneously intercepts and Website users' button clicks (conveying responses to questions and prompts, conveying Website users' respective desires that the Website would supply them with certain information and/or responses, and conveying other selections).  For example:

id: 722526119540790
ev: SubscribedButtonClick
dl: https://apply.td.com/eo/eouma/main/api/#/personalApp/aboutYou
rl: https://www.td.com/
if: false
ts: 1723054358236
cd[buttonFeatures]: {"classList":"mat-calendar-body-cell ctHidden mat-calendar-body-active","destination":"","id":"","imageUrl":"","innerText":"
EB","numChildButtons":0,"tag":"button","type":"button","name":"","value":""}
cd[buttonText]: FEB
cd[formFeatures]: []
cd[pageFeatures]: {"title":"TD Apply"}

ev: SubscribedButtonClick
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1
rl: https://www.td.com/
if: false
ts: 1723055553368
cd[buttonFeatures]: {"classList":"td-button td-button-block td-button-clear-green br-btn-margin br-btn","destination":"https://choosemyproduct.td
bank.com/personal/#/personal/1","id":"","imageUrl":"","innerText":"24 to 59","numChildButtons":0,"tag":"div","type":null}
cd[buttonText]: 0 to 0
cd[formFeatures]: [{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"},
{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"}]
cd[pageFeatures]: {"title":"TD Product Selector"}

ev: SubscribedButtonClick
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1/3
rl: https://www.td.com/
if: false
ts: 1723055832061
cd[buttonFeatures]: {"classList":"td-button td-button-block td-button-clear-green br-btn-margin br-btn","destination":"https://choosemyproduct.td
bank.com/personal/#/personal/1/3","id":"","imageUrl":"","innerText":"Borrowing money/ consolidating debts","numChildButtons":0,"tag":"div","typ
e":null}
cd[buttonText]: Borrowing money/ consolidating debts
cd[formFeatures]: [{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"},
{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"qu
estion","tag":"input","inputType":"radio"}]
cd[pageFeatures]: {"title":"TD Product Selector"}

ev: SubscribedButtonClick
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5
rl: https://www.td.com/
if: false
ts: 1723056078526
cd[buttonFeatures]: {"classList":"td-button td-button-block td-button-clear-green br-btn-margin br-btn","destination":"https://choosemyproduct.td
bank.com/personal/#/personal/1/3/4/5","id":"","imageUrl":"","innerText":"No","numChildButtons":0,"tag":"div","type":null}
cd[formFeatures]: [{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"}]

ev: SubscribedButtonClick
dl: https://choosemyproduct.tdbank.com/personal/#/personal/1/3/4/5/1
rl: https://www.td.com/
if: false
ts: 1723056203115
cd[buttonFeatures]: {"classList":"td-button td-button-block td-button-clear-green br-btn-margin br-btn","destination":"https://choosemyproduct.td
bank.com/personal/#/personal/1/3/4/5/1","id":"","imageUrl":"","innerText":"Earning more rewards on dining or travel","numChildButtons":0,"ta
g":"div","type":null}
cd[buttonText]: Earning more rewards on dining or travel
cd[formFeatures]: [{"id":"","name":"question","tag":"input","inputType":"radio"},{"id":"","name":"question","tag":"input","inputType":"radio"},
{"id":"","name":"question","tag":"input","inputType":"radio"}]

44.     As shown by the red highlights in the above excerpts of the Website's transmissions, Meta uses the "SubscribedButtonClick" event on the Website.  Thereby, Meta intercepts when Website users "click on something the pixel detects as a button or link[,]" along with "the button or link's text."[30]  From top to bottom, the blue highlights show that Meta intercepted button clicks on "FEB" (as in birth month of February); "24-59" (as in age); "Borrowing money/ consolidating debts" (as in financial goals); "No" (as in current homeownership status); and "Earning more rewards on dining or travel" (as in desired perks).

## IV.    The Third Parties Use Pennsylvanians' Data for their Own Purposes

45.     When the Third Parties use their respective wiretaps on Website users' communications, the wiretaps are not like tape recorders or "tools" used by one party to record the other.  Instead, the Third Parties—separate and distinct entities from the parties to the conversations—use the wiretaps to eavesdrop upon, record, extract data from, and analyze

---

[30] HackerNoon, How to Fix Your Organization's Meta Pixel Problem, https://hackernoon.com/how-to-fix-your-organizations-meta-pixel-problem.

conversations to which they are not parties.  The Third Parties, themselves, collect the contents of said conversations.  That data is then analyzed by the Third Parties before being provided to any entity that was a party to the conversations (like Defendant).

46.     The Third Parties each have the capability to use the contents of conversations they collect through their respective wiretaps for their own purposes.

47.     Adobe states, in the "Adobe Experience Cloud Terms of Use": "You grant Adobe a worldwide, royalty-free, non-exclusive, transferable, and sublicensable license to adapt, display, distribute, modify, perform, publish, reproduce, translate, and use Your Materials for the purpose of operating, marketing and improving the Services and enabling your use of the Services."[31] Adobe defines "Materials" as "any materials provided by You, Adobe, or a third party, including without limitation any (a) user material, including usage and telemetry activities; (b) reports, text, code, data, documents, images, photographs, graphics, audio, videos, or webcasts; (c) products; or (d) Software."[32]   Thus, Adobe has the capability to use the wiretapped data for operating, marketing, and improving its services.

48.     In its "Shared Data Under Measurement Controller-Controller Data Protection Terms," Google states: "When Google Analytics customers enable the data sharing setting for … Google Analytics[] and accept the 'Measurement Controller-Controller Data Protection Terms' … Google can access and analyze the Analytics data customers share with us to better understand online behavior and trends, and improve our products and services—for example, to improve Google search results, detect and remove invalid advertising traffic in Google Ads, and test algorithms and build models that power services like Google Analytics Intelligence that apply machine-learning to surface suggestions and insights for customers based on their analytics data and like Google Ads that applies broad models to improve ads personalization and relevance."[33]

---

[31] ADOBE, ADOBE EXPERIENCE CLOUD TERMS OF USE,
https://www.adobe.com/content/dam/cc/en/legal/servicetou/Experience_Cloud_TOU_en_WW_2
0220608.pdf.

[32] *Id.*

[33] GOOGLE, SHARED DATA UNDER MEASUREMENT CONTROLLER-CONTROLLER DATA
PROTECTION TERMS, https://support.google.com/analytics/answer/9024351.

Thus, Google has the capability to use the wiretapped data for understanding online behavior and trends, machine learning, and improving its products and services.

49.    Meta confirms, in its "Meta Business Tools Terms,"[34] that it has the capability to use information it collects for purposes other than recording it and conveying it to Defendant.  For instance, Facebook can use the information it collects "to promote safety and security on and off the Meta Products, for research and development purposes and to maintain the integrity of and to provide and improve the Meta Products."  In other words, Meta can use the wiretapped information for its own "research and development," and well as to "protect" its own products and services.  Meta can also connect all information it collects to analyze and generate reports regarding advertising campaigns, create custom audience sets that can be shared with other advertisers, and "use your Event Data for ads delivery only after aggregating such Event Data with other data collected from other advertisers or otherwise collected on Meta Products."[35]  Further, Meta can use the event data to help websites like Defendant's "reach people with transactional and other commercial messages on [Facebook] Messenger and other Meta Products."[36]  Finally, Meta can use the information it collects "to personalize the features and content (including ads and recommendations) that we show people on and off our Meta Products."[37]  Thus, Meta has the capability to use the information it wiretaps for purposes other than simply providing a recording to Defendant, including but not limited to its own contact information matching; measurement and analytics services; ad targeting; commercial and transactional messages; ad delivery improvement; feature and content personalization; and product improvement, provision, and securement.

50.    TD knows (and knew when procuring the Third Parties) that the Third Parties were separate and distinct entities from the TD Website, the TD consumers, and the TD conversations at issue.  TD knows that the Third Parties uses the tracking technologies to eavesdrop upon and

---

[34] META, META BUSINESS TOOLS TERMS, https://m.facebook.com/legal/businesstech.

[35] Id.

[36] Id.

[37] Id.

record TD conversations to which they are not a party, and that the Third Parties thereby collect the contents of communications between TD consumers and TD. Indeed, TD hired and paid the Third Parties money for the Third Parties' services, and therefore had every expectation that the Third Parties would do exactly this. TD also knows that the Third Parties have the capability to use the wiretapped data to, *inter alia*, improve the Third Parties' own products and services. TD agreed to the Third Parties' terms explaining the foregoing. Accordingly, TD's procurement of the Third Parties' wiretapping was done knowingly, willfully, and intentionally.

## V.    Defendant Never Received Users' Consent to Disclose their Communications

51.     To summarize the above allegations, the Third Parties, as procured and enabled by Defendant, collect the contents of Pennsylvanians' communications with the Website using the Third Parties' respective tracking technologies. These communications include, but are not limited to, "nonpublic personal information," as defined by the GLBA. *See* Statement of Facts, *supra*. This is information that is affirmatively entered by users on the Website. *Id.*

52.     Crucially, neither Defendant nor the Third Parties procure prior consent from Pennsylvanians for the Third Parties to engage in this wiretapping.

53.     TD's "Terms of Use" merely state: "Your use of this Site, and our collection and use of your information, is subject to our Online Privacy Code and Privacy Notice(s) provided on the Site. By accessing or using the Site, you understand and agree that we may collect, use, retain, and share personal or other information about you or the device you use to access the Site."[38] This "Privacy Notice"[39] – specifically, its included "What Do The TD Bank Companies Do With Your Personal Information?"[40] sheet defines "Nonaffiliates" as "Companies not related by common ownership or control. They can be financial and nonfinancial companies[,]" and

---

[38] TD, TERMS OF USE, https://www.td.com/content/dam/tdb/document/pdf/personal-banking/td-website-terms-of-use-en.pdf.

[39] TD, PRIVACY NOTICE AND MARKETING PREFERENCES, https://www.td.com/us/en/personal-banking/privacy.

[40] TD, WHAT DO THE TD BANK COMPANIES DO WITH YOUR PERSONAL INFORMATION?, https://www.td.com/content/dam/tdb/document/pdf/personal-banking/privacy-shareinformation-en.pdf.

states that "The TD Bank Companies do not share with nonaffiliates so they can market to you." But, as set out *supra* and *infra*, Defendant *does* allow for the collection of Website users' personal information, including by the Third Parties, even when it has not received consent from Website users to do so.

54.    Likewise, Adobe, Google, and Meta never receive consent from Website users to intercept and collect electronic communications containing their sensitive and unlawfully disclosed information.  And in fact, Meta expressly warrants the opposite.

55.    When first signing up for Facebook, a user assents to three agreements: the Meta Terms of Service,[41] the Cookies Policy,[42] and the Privacy Policy.[43]  For California residents, Meta also publishes a United States Regional Privacy Notice.[44]

56.     Meta's Terms of Service begin by stating that "[p]rotecting people's privacy is central to how we've designed our ad system."[45]  The Terms of Service then prohibit anyone from using Facebook's Products in a manner that is "unlawful, misleading, discriminatory or fraudulent[.]"[46]

57.    Meta's Privacy Policy describes how Meta receives information like "[w]ebsites you visit and cookie data, like through Social Plugins or the Meta Pixel[,] … [h]ow you use our partners' products and services, online or in person[,] … [and] information like your email address, cookies and advertising device ID[.]"[47]  Specifically, Meta acknowledges that "[w]e collect and receive information from partners, … [and] receive this information whether or not you're logged

---

[41] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[42] META, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[43] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy.  *See also* https://mbasic.facebook.com/privacy/policy/printable/.

[44] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[45] META, TERMS OF SERVICE, https://www.facebook.com/legal/terms/update.

[46] *Id.*

[47] META, PRIVACY POLICY, https://www.facebook.com/privacy/policy.  *See also* https://mbasic.facebook.com/privacy/policy/printable/.

in or have an account on our Products."[48]

58.    Meta then offers an express representation: "We require partners to have the right to collect, use and share your information before giving it to us."[49]  Meta also acknowledges collecting "information with special protections[,]" meaning information that "could have special protections under the laws of your jurisdiction[,]" but critically, only sensitive information that users "choose to provide."[50]

59.    Meta's Cookies Policy ratifies those representations, stating "the Privacy Policy will apply to our processing of the data that we collect via cookies."[51]

60.    For California residents, Meta reiterates that policy: "We require each of these partners to have rights to collect, use, and disclose your information before providing any information to us."[52]  The United States Regional Privacy Notice also restricts Meta's ability to collect "sensitive personal information," stating they "will only use or disclose it either with your specific consent when required, or as otherwise permitted by law, including the CCPA."[53]

61.    Meta's other representations reinforce these warranties.  In its Advertising Policy, Meta states, "[w]e do not use sensitive personal data for ad targeting."[54]  And in a blog post titled "About Restricted Meta Business Tools Data," Meta asserts it has "policies around the kinds of information businesses can share with us."[55]  Meta does not "want websites or apps sending us certain restricted information about people."[56]  Sensitive information includes, among other things,

---

[48] *Id.*

[49] *Id.*

[50] *Id.*

[51] META, COOKIES & OTHER STORAGE TECHNOLOGIES, https://www.facebook.com/policies/cookies/.

[52] META, UNITED STATES REGIONAL PRIVACY NOTICE, https://www.facebook.com/privacy/policies/uso/.

[53] *Id.*

[54] META, ADVERTISING POLICY, https://www.facebook.com/policies/ads/.

[55] META, ABOUT RESTRICTED META BUSINESS TOOLS DATA, https://www.facebook.com/business/help/1057016521436966?id=188852726110565.

[56] *Id.*

"any information defined as sensitive under applicable laws, regulations and applicable industry guidelines."[57]

62.     These representations are repeated frequently.  Meta created a "Help Center" to better explain its practices to users.  In an article titled, "How does Meta receive information from other businesses and organizations?," Meta reiterates its promise to "prohibit businesses or organizations from sharing sensitive information with us," and if Meta "determine[s] that a business or an organization is violating our terms, we'll take action against that business or organization."[58]   In another article, titled, "How does Meta work with data providers?," Meta repeats this promise, stating "[b]usinesses that advertise on Facebook are required to have any necessary rights and permissions to use this information, as outlined in our Custom Audience Terms that businesses must agree to."[59]

63.     A reasonable user who reads Meta's terms and representations would understand those terms as requiring Meta to enforce an advertiser's compliance with its terms.  At a minimum, those terms and representations require Meta to build safeguards for sensitive information.  No reasonable user would read those terms and representations as permitting Meta to intentionally intercept electronic communications that it knows the law protects and deems sensitive.  And no user could read those terms as allowing Meta to aid and abet another party's disclosure of such protected and sensitive information.   In short, Meta never receives consent from users to intentionally intercept and monetize electronic communications disclosing sensitive information that the law protects.

## CLASS ACTION ALLEGATIONS

64.     Plaintiff seeks certification of the following class: all Pennsylvania residents who have accessed and navigated the Website while in Pennsylvania (the "Class").

---

[57] *Id.*

[58] META, HOW DOES FACEBOOK RECEIVE INFORMATION FROM OTHER BUSINESSES AND ORGANIZATIONS, https://www.facebook.com/help/2230503797265156.

[59] META, HOW DOES META WORK WITH DATA PROVIDERS?, https://www.facebook.com/help/494750870625830.

65.    Plaintiff reserves the right to modify the Class definition, including by using subclasses, as appropriate based on further investigation and discovery obtained in the case.

66.    The following people are excluded from the Class: (1) any Judge presiding over this action and members of her or her family; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which Defendant or its parents have a controlling interest (including current and former employees, officers, or directors); (3) persons who properly execute and file a timely request for exclusion from the Class; (4) persons whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiff's counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons.

67.    **Numerosity:** The number of persons within the Class is substantial and believed to amount to thousands, if not millions of persons.  It is, therefore, impractical to join each member of the Class as a named plaintiff.  Further, the size and relatively modest value of the claims of the individual members of the Class render joinder impractical.  Accordingly, utilization of the class action mechanism is the most economically feasible means of determining and adjudicating the merits of this litigation.  Moreover, the Class is ascertainable and identifiable from Defendant's records.

68.    **Commonality and Predominance:** There are well-defined common questions of fact and law that exist as to all members of the Class and that predominate over any questions affecting only individual members of the Class.  These common legal and factual questions, which do not vary between members of the Class, and which may be determined without reference to the individual circumstances of any Class member, include, but are not limited to, the following: whether Defendant violated the WESCA and whether Plaintiff and the proposed Class members are entitled to damages, reasonable attorneys' fees, pre-judgment interest and costs of this suit.

69.    **Typicality:** The claims of the named Plaintiff are typical of the claims of the Class because the named Plaintiff, like all other class members, accessed and navigated the

Website and had her confidential electronic communications intercepted and disclosed to the Third Parties.

70.    **Adequate Representation:** Plaintiff is an adequate representative of the Class because her interests do not conflict with the interests of the Class members she seeks to represent, she has retained competent counsel experienced in prosecuting class actions, and she intends to prosecute this action vigorously. The interests of members of the Class will be fairly and adequately protected by Plaintiff and her counsel.

71.    **Superiority:** The class mechanism is superior to other available means for the fair and efficient adjudication of the claims of members of the Classes. Each individual member of the Class may lack the resources to undergo the burden and expense of individual prosecution of the complex and extensive litigation necessary to establish Defendant's liability. Individualized litigation increases the delay and expense to all parties and multiplies the burden on the judicial system presented by the complex legal and factual issues of this case. Individualized litigation also presents a potential for inconsistent or contradictory judgments. In contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court on the issue of Defendant's liability. Class treatment of the liability issues will ensure that all claims and claimants are before this Court for consistent adjudication of the liability issues.

**CLAIMS FOR RELIEF**

**<u>COUNT I</u>**
**Violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act**
**18 Pa. Cons. Stat. § 5701, *et seq.***

72.    Plaintiff repeats the allegations contained in the paragraphs above as if fully set forth herein.

73.    Plaintiff brings this Count individually and on behalf of the members of the Class.

74.    The Pennsylvania Wiretapping and Electronic Surveillance Control Act prohibits (1) the interception or procurement of another to intercept any wire, electronic, or oral

communication; (2) the intentional disclosure of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication; and (3) the intentional use of the contents of any wire, electronic, or oral communication that the discloser knew or should have known was obtained through the interception of a wire, electronic, or oral communication.  18 Pa. Cons. Stat. § 5703.

75.    Any person who intercepts, discloses, or uses or procures any other person to intercept, disclose, or use, a wire, electronic, or oral communication in violation of the Act is subject to a civil action for (1) actual damages, not less than liquidated damages computed at a rate of $100 per day for each violation or $1,000, whichever is higher; (2) punitive damages; and (3) reasonable attorneys' fees and other litigation costs incurred.  18 Pa. Cons. Stat. § 5725(a).

76.    At all relevant times, Defendant procured the Third Parties to track and intercept Plaintiff's and Class members' internet communications while navigating the Website that Defendant owns and operates, td.com and tdbank.com.

77.    Defendant, when procuring the Third Parties to intercept Plaintiff's communications, intended for the Third Parties to learn the meaning of the content that Website visitors requested.

78.    At all relevant times, the Third Parties intentionally used the intercepted communications for their own purposes, including to improve the Third Parties' own products and services.

79.    The wiretapping of Plaintiff and Class Members occurred in Pennsylvania, where Plaintiff and Class Members accessed the Website and where the Third Parties—as enabled by Defendant—routed Plaintiff's and Class Members' electronic communications to their servers.

80.    These communications were intercepted without authorization and consent from Plaintiff and Class Members.  Plaintiff and Class Members did not provide their prior consent to the Third Parties' intentional access, interception, reading, learning, recording, collection, and

usage of Plaintiff's and Class Members' electronic communications. Nor did Plaintiff and Class Members provide their prior consent to Defendant's procuring the Third Parties for the foregoing.

81. Plaintiff and Class members were not aware that their electronic communications were being intercepted by the Third Parties.

82. Plaintiff and Class members had a justified expectation under the circumstances that their electronic communications would not be intercepted. Said electronic communications consisted of "nonpublic personal information," as defined by 16 C.F.R. § 313.3 (the Gramm-Leach-Biley Act).

83. Plaintiff and Class Members have been injured by Defendant's WESCA violations, and pursuant to 18 Pa. Cons. Stat. § 5725(a), each seeks statutory damages of $1,000 for each of Defendant's violations of WESCA.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all others similarly situated, seeks judgment against Defendant, as follows:

(a)    Determining that this action is a proper class action;

(b)    For an order certifying the Class, naming Plaintiff as representative of the Class, and naming Plaintiff's attorneys as Class Counsel to represent the Class;

(c)    For an order declaring that Defendant's conduct violates the statute referenced herein;

(d)    For an order finding in favor of Plaintiff and the Class on the count asserted herein;

(e)    Awarding compensatory damages, including statutory damages where available, to Plaintiff and the Class Members against Defendant for all damages sustained as a result of Defendant's wrongdoing, in an amount to be proven at trial;

(f)    For punitive damages, as warranted, in an amount to be determined at trial;

(g)    Ordering Defendant to disgorge revenues and profits wrongfully obtained;

(h)    For prejudgment interest on all amounts awarded;

(i)     For injunctive relief as pleaded or as the Court may deem proper;

(j)     For an order awarding Plaintiff and the Class their reasonable attorneys' fees and expenses and costs of suit; and

(k)     Granting Plaintiff and the Class Members such further relief as the Court deems appropriate.

## JURY DEMAND

Plaintiff hereby demands a trial by jury on all claims so triable in this action.

Dated:  August 21, 2024                    Respectfully submitted,

**SHUB & JOHNS LLC**

By: */s/ Benjamin F. Johns*
        Benjamin F. Johns

Benjamin F. Johns (SBN 201373)
Four Tower Bridge
200 Barr Harbor Drive, Suite 400
Conshohocken, PA 19428
Telephone: (610) 477-8380
Email: bjohns@shublawyers.com

**BURSOR & FISHER, P.A**.
Philip L. Fraietta*
Joshua D. Arisohn*
1330 Avenue of the Americas, 32nd Floor
New York, NY  10019
Telephone: (646) 837-7150
Facsimile: (212) 989-9163
Email: pfraietta@bursor.com
         jarisohn@bursor.com

**BURSOR & FISHER, P.A**.
Brittany S. Scott*
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
Telephone: (925) 300-4455
Facsimile: (925) 407-2700
Email: bscott@bursor.com

*Pro Hac Vice*

*Attorneys for Plaintiff and the Putative Class*

28